FILED
CLERK U.S. DISTRICT COURT

MAR 2 1 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT
10      CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION
11
12
13
14
15   LENIN GARCIA,                    )  CV 05-2177-CJC (SH)
                                      )
16                  Plaintiff,        )  ORDER ADOPTING REPORT AND
                                      )  RECOMMENDATION OF UNITED
17                                    )  STATES MAGISTRATE JUDGE
                                      )
18   RALPH COLUNGA, et al.,           )
                                      )
19                  Defendants.       )
                                      )
20   ────────────────────────────────
           Pursuant to 28 U.S.C. Section 636(b)(1)(C), the Court has reviewed the First
21
     Amended Complaint, defendants' motion for summary judgment and declarations
22
     in support thereof, and plaintiff's Opposition to the motion and declaration and
23
     exhibits in support thereof, along with the attached  Report and Recommendation
24
     of the United States Magistrate Judge, and has made a de novo determination of the
25
     Report and Recommendation.
26
     ///
27
     ///
28

                                          1

IT IS THEREFORE ORDERED that an Order be entered (1) approving and adopting the Report and Recommendation, (2) granting defendants' Motion for Summary Judgment with respect to plaintiff's retaliation claim; and (3) denying defendants' Motion for Summary Judgment with respect to plaintiff's excessive force and conspiracy claims.

IT IS FURTHER ORDERED that the Clerk shall serve forthwith a copy of this Order Adopting and the Order of this date on the Plaintiff and counsel for Defendants.

DATED: _March 21, 2008_

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

FILED
CLERK U.S. DISTRICT COURT

FEB 1 3 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

LENIN GARCIA,                     )     Case No. CV 05-2177-CJC (SH)
                                  )
                Plaintiff,        )     REPORT AND RECOMMENDATION OF
                                  )     UNITED STATES MAGISTRATE JUDGE
          v.                      )
                                  )
RALPH COLUNGA, et al.,            )
                                  )
                Defendants.       )
_____ )

    This Report and Recommendation is submitted to the Honorable Cormac J. Carney, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 01-13 of the United States District Court for the Central District of California.  For the reasons discussed below, summary judgment should be granted in part in favor of defendants, and denied in part.

## I. PROCEEDINGS

    On June 19, 2006, pro se plaintiff Lenin Garcia, a prisoner at California State

1   Prison-Lancaster ("CSP-LAC"),[1]  filed a Verified First Amended Complaint ("FAC") [2]

2   pursuant to 42 U.S.C. § 1983. In that pleading, plaintiff alleges that defendants subjected

3   him to an excessive use of force, conspired to use excessive force and to cover up that

4   force, and retaliated against him for filing grievances regarding his medical needs. [FAC

5   21-42, 48-59.]  Plaintiff sues Correctional Sergeant Ralph Colunga ("Colunga");

6   Correctional Officers Oscar Herrera ("Herrera"), Michael Juno ("Juno"), and Tom

7   Williamson ("Williamson"); Chief Medical Officer J. Fitter ("Dr. Fitter"); Doctors

8   Eugene Morong ("Dr. Morong") and P. Fortaleza ("Dr. Fortaleza"); Medical Technician

9   Assistant Renato Blanco ("Blanco");[3] and Correctional Captain S. Reed ("Reed").  [FAC

10  11-20.]  Plaintiff sues the defendants in their individual capacities, seeking injunctive

11  relief, declaratory relief, and compensatory damages and punitive damages from each

12  defendant. [FAC  60-62.][4]

13  ————————————————

14      [1]At all times relevant herein, plaintiff was incarcerated at CSP-LAC.   As of mid-

15  February, 2007, plaintiff has been incarcerated at the state prison in San Diego.

16      [2]Although no form verification is attached to the FAC,  other indicia the FAC

17  itself [see FAC 62],  as well as the fact that plaintiff incorporates the FAC throughout his
    Opposition to the Motion for Summary Judgment (whose contents plaintiff verifies),

18  indicates that plaintiff has in fact verified the contents of the FAC. [See note 11, infra.]

19  There being no contention otherwise, the court so concludes and proceeds on that basis.

20

21      [3]Defendant Renato Blanco was not present in the United States on July 27, 2005,

22  when the United States Marshal attempted service of the initial complaint, but was due to
    return to the county in October 2005. On May 24, 2006, the Magistrate Judge issued a

23  Minute Order directing the Marshal to re-attempt service on defendant Blanco. To date,

24  defendant Blanco apparently still has not been served.

25      [4]Several exhibits – Exhibits A-Z, and 1-20 – are attached to the FAC. The court

26  has reviewed all of them.  With some variation not pertinent to the determination of
    summary judgment, most are duplicates of exhibits submitted by plaintiff in opposition

27  to the motion for summary judgment which are itemized, supra .  Except where

28                                                                                   (continued...)

                                              2

1    The defendants filed an Answer to the FAC on December 11, 2006.

2        On October 23, 2007, defendants Colunga,, Herrera, Juno,, Reed, and Williamson,

3    and Doctors Morong, Fitter, and Fortaleza, filed a Motion for Summary Judgment. In

4    support of their motion, defendants submitted the following documents: (1) Declaration

---

[4](...continued)

specifically noted, all citations herein are to the exhibits attached to plaintiff's opposition.

Summarily, the exhibits attached to the FAC are as follows: Exhibits "A" through "R" to the FAC contain numerous documents pertaining to plaintiff's exhaustion of administrative remedies [See FAC 4-10], an issue that is not before the court or pertinent to the motion for summary judgment. Exhibit "S" to the FAC contains several pages relating to a "Rules Violation Report" ("RVR") following the cell extraction, as well as plaintiff's grievance and appeal regarding the outcome of the RVR (some pages of which are duplicates of other exhibits). Exhibits "T" through "W," "X," and "Z" to the FAC are duplicates of Exhibits "C," "D," and "G," respectively, to the opposition to the summary judgment motion. Exhibit "Y" to the FAC consists of two pages (both relating to the RVR, and included in Exhibit "S"), the first page of which is a duplicate of Exhibit "F" to the opposition. Exhibit "1" to the FAC is a duplicate of Exhibit "A;" Exhibit "2" to the FAC is a duplicate (and a better copy) of Exhibit "Z" to the FAC and Exhibit "G" to the opposition; Exhibits "3" and "4" of the FAC are essentially duplicates of Exhibits "N" and "O" to the opposition; Exhibits "5" through "8" to the FAC are duplicates of Exhibit "P" to the opposition; Exhibit "15" to the FAC is a duplicate of Exhibit "T" to the opposition; and Exhibits "16," "17" and "18" to the FAC are duplicates of Exhibits "S," "R," and "Q," respectively, to the opposition.   Exhibits "9" and "10" to the FAC are duplicates of exhibits submitted by defendants in support of the motion for summary judgment. [See Declaration of P. Fortaleza in Support of Defendants' Motion for Summary Judgment ("Fortaleza Dec."), Exs. D, E.]   Exhibits "11" and "12" to the FAC relate to grievances filed by plaintiff against Fortaleza and others, respectively, on September 5 and July 8, 2004. Exhibit "13" to the FAC is a copy of a letter addressed to plaintiff from the Rosen, et.al., law firm, regarding litigation against the CDC; Exhibit 14 to the FAC two documents relating to plaintiff's placement in administrative segregation after the cell extraction; and Exhibits "19" and "20" are copies of two of plaintiff's medical records.

3

of J. Hamlin, dated October 16, 2007, with attached exhibit;[5] (2) Declaration of S. Reed, dated October 17, 2007; (3) Declaration of V. Mallory, undated, with attached exhibit;[6] (4) Declaration of J. Fitter, M.D., dated October 10, 2007; (5) Declaration of M. Juno, dated October 9, 2007; (6) Declaration of P. Fortaleza, M.D., dated October 12, 2007, with exhibits;[7] (7) Declaration of T. Williamson, dated October 15, 2007; (8) Declaration of O. Herrera, dated October 10, 2007; (9) Declaration of R. Colunga, dated October 11, 2007, with exhibits;[8] (10) Declaration of R. Cobb, dated October 9, 2007, with exhibits;[9]

---

[5] Attached as Exhibit A to Hamlin's Declaration are color copies of photographs taken of Plaintiff by Hamlin on August 15, 2003, at approximately 11:30 a.m.

[6] Attached as Exhibit A to Mallory's Declaration is "a true and correct copy of Plaintiff's bed/cell movement history that was extracted , via the [California Department of Corrections and Rehabilitation ("CDCR") Distributed Data Processing  Processing System] DDPS database."

[7] Exhibit A to Fortaleza's Declaration is "a true and correct copy of [Fortaleza's] Progress Notes for Plaintiff's exam on September 16, 2003[;]" Exhibit B is "a true and correct copy of [Fortaleza's] Progress Notes for Plaintiff's exam on February 5, 2004[;]" Exhibit C is "a true and correct copy of the Podiatric consultation report dated February 27, 2004[;]" Exhibit D is "a true and correct copy of Plaintiff's appeal [of Fortaleza's decision to discontinue [Plaintiff's] chronos, Log. No. LAC-C-04-00609] and the responses[;]" Exhibit E is a "true and correct copy of Plaintiff's exam on July 13, 2004[;]" and Exhibit F is "a true and correct copy of [Plaintiff's] x-ray test results" of May 4, 2004 and July 13, 2004.  The court notes that Exhibits A, B and E contain handwritten entries that are not particularly legible.

[8] Exhibit A to Colunga's Declaration is "a true and correct copy of the Rules Violation Report (CDCR Form 115) Log No. C03-08-0030, which was issued to Plaintiff on August 15, 2003, for attempted assault on a peace officer;" Exhibit B is "a true and correct copy of [Colunga's] supplemental Crime/Incident Report (CDCR Form 837c) Log No. LAC-C03-08-0413, dated August 15, 2003[.]"

[9] Exhibit A to Cobb's Declaration is copy of a computer generated report of "Plaintiff's Inmate Movement History" obtained from the Offender Based Information

(continued...)

4

1   (11); Declaration of E. Morong, M.D., with exhibits;[10] and (12) and Declaration of

2   Susan Coleman, unsigned and undated, and exhibit.[11] Defendants also filed a proposed

3   Statement of Uncontroverted Facts and Conclusions of Law ("Def. Uncontroverted

4   Facts") in support of the motion for summary judgment.

5       In a Minute Order issued on October 24, 2007, the Court notified plaintiff in detail

6   of the requirements for opposing a motion for summary judgment.

7       Petitioner filed an Opposition to defendants' Motion for Summary Judgment on

8   November 13, 2007.[12] In support of his opposition, plaintiff submitted the following

9   documents: (1) a copy of the "general chrono" dated August 13, 2003 re: notice of

10  confiscation of plaintiff's appliances as a result of his refusal to double-cell [Exhibit

11  (Ex.") A]; (2) copies of Defendants' Colunga, Juno, Herrera, Williamson, Morong,

12  Reed, Fitter and Fortaleza Responses to Plaintiff's Interrogatories [Ex. B] ; (3) copies of

13  Department of Corrections Crime/Incident reports of defendants Colunga, Juno, Herrera,

14

---

15  [9](...continued)
16  Systems maintained by the Offender Information Services Branch of the CDCR; Exhibit
    B is "a true and correct copy of Plaintiff's Abstract of Judgment."

17
18  [10]Exhibit A to Morong's Declaration is "a true and correct copy of the suicide risk
    assessment [Morong] conducted on Plaintiff on August 15, 2003;" Exhibit B is "a true
19  and correct copy of [Morong's] Progress notes regarding [his] evaluation of [Plaintiff] on
    August 15, 2003."
20

21  [11]Exhibit A to Coleman's Declaration consists of excerpts from plaintiff's
22  deposition taken August 9, 2007.

23  [12]Plaintiff has declared, under penalty of perjury, that the contents of his
    opposition – which incorporates factual allegations in the FAC – are true and correct.
24  [Opp. at 34.]  Accordingly,  the court considers the factual allegations made therein, the
    FAC, and "Plaintiff's Declaration in Opposition To Defendants Motion For Summary
25  Judgment" ("Pltf. Dec."), filed as "Exhibit J" to the opposition.  In the opposition,
26  plaintiff also requests "referral to the pro bono project for appointment of counsel on this
27  matter." [Opp. at 34.]  However, plaintiff has failed to show "exceptional
    circumstances" warranting the appointment of counsel at this stage.
28

1   and Williamson [Ex. C1-C4]; (4) a copy of report from plaintiff's medical file by

2   defendant Morong and dated August 15, 2003 [Ex. D]; (5) "Defendants Reed/Morong

3   Order/Requested that the plaintiff be cell extracted" (copy of document titled "Cover

4   Sheet" and bearing the same incident log number of the incident reports of defendants

5   Colunga, Juno, Herrera and Williamson noted above) [Ex. E]; (6) copy of document

6   entitled "Rules Violation Report" [Ex. F]; (7) copy of medical report dated August 15,

7   2003  [Ex. G]; (8) Declaration of Ruben Garcia [Ex. H]; (9) Declaration of Oscar

8   Machado [Ex. I]; (10) "Plaintiff Declaration In Opposition To Defendants Motion For

9   Summary Judgement [sic]" [Ex. J ("Pltf. Dec.")]; (11) copy of "Chronological

10  Interdisciplinary Progress Notes" from plaintiff's medical file containing handwritten

11  entry by Doctors Taylor (Psychologist) and Kadish, dated April 10 and June 24, 2004,

12  respectively  [Ex. K]; (12) copy of "Chronological Interdisciplinary Progress Notes"

13  containing a handwritten entry of psychiatrist P.W. Davidson dated July 13, 2004 [Ex.

14  L]; (13) copies of photographs of plaintiff taken by Sgt. Hamlin on the date of the

15  incident [Ex. M]; (14) copy of "X-Ray Request and Report Form" dated January 13,

16  1995 from plaintiff's medical file (documenting multiple bullet fragments in plaintiff's

17  right knee)[Ex. N]; (15) copy of "X-Ray Request Report Form" dated July 9 and 13,

18  2003, from plaintiff's medical file (re: plaintiff's lumbar spine with diagnosis of

19  "degenerative osteophytes") and copies of information from the website "Spine-

20  Health.Com." [Ex. O]; (16) copies of "lower bunk chronos" from plaintiff's medical file

21  [Ex. P]; (17) copy of a grievance filed by plaintiff against defendant Fitter on April 4,

22  2002 [Ex. Q]; (18) copy of a grievance filed by plaintiff against defendant Fitter on

23  December 20, 2002 [Ex. R]; (19) copy of a grievance filed by plaintiff against defendant

24  Fitter dated June 11, 2003 [Ex. S]; and (20) copy of a grievance filed by plaintiff against

25  defendant Fortaleza dated February 11, 2004 [Ex. T].

26         On November 26, 2007, the defendants filed a reply to plaintiff's Opposition, and

27  lodged a copy of a videotape of an institutional post-incident interview of plaintiff.

28

6

1  Plaintiff filed a "Reply to Defendants Reply Motion For Summary Judgment" on

2  December 4, 2007.

3       The matter has been taken under submission and is ready for decision.[13]

4                    **II. <u>STANDARD OF REVIEW</u>**

5       A motion for summary judgment should be granted if there is no genuine issue of

6  material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

7  Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505,

8  91 L.Ed.2d 202 (1986). A party moving for summary judgment bears the initial burden

9  of informing the court of the basis for the motion and identifying the portions of the

10  pleadings, depositions, answers to interrogatories, admissions, or affidavits which

11  demonstrate the absence of a triable issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477

12  U.S. 317, 323, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[14] The burden then shifts to

13  the nonmoving party, who must show that there remains a "genuine issue of material

14  fact" warranting trial. Fed. R. Civ. P. 56(e); <u>Celotex</u>, 477 U.S. at 324. In resolving a

15

16  _____

17       [13]Neither side has sought to exclude any of the exhibits or declarations filed by the
other. Defendants do, however, argue in their Reply that certain statements relied upon

18  by plaintiff – one contained within the RVR [Opp. at 7] and the other in the Declaration
of Ruben Garcia [Opp. Ex. H] – are hearsay. [<u>See</u> Def. Reply at 5, 7.] To the extent this

19  argument constitutes an evidentiary objection, as discussed more fully below, it is

20  overruled as to the statement in the RVR. [<u>See</u> Fn. 15, <u>infra.</u>] Whether or not the
statement by Ruben Garcia that he "heard about the fabrication of CDC 115 rules

21  violation reports," constitutes hearsay, the court concludes that the statement is

22  inconsequential to the disposition of the summary judgment motion, and on that basis,

23  has not considered it.

24       [14]Affidavits supporting (and opposing) summary judgment must be made on

25  personal knowledge, must set forth admissible statements of fact, and must show
affirmatively that the affiant is competent to testify to the matters stated therein.

26  Fed.R.Civ.P. 56(e). A Verified Complaint, to the extent it is based on plaintiff's

27  personal knowledge, meets the affidavit requirement. <u>McElyea v. Babbiitt</u>, 833 F. 2d

28  196, 198 n. 1 (9th Cir. 1987).

1   motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of

2   determining whether there is the need for a trial – whether, in other words, there are any

3   genuine factual issues that can be resolved only by a finder of fact because they may

4   reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

5          Under this standard, the mere existence of an alleged factual dispute between the

6   parties will not withstand summary judgment. Scott v. Harris, __ U.S. __, 127 S.Ct.

7   1769, 1776, 167 L.Ed.2d 686 (2007).  A factual dispute qualifies as "material" only if it

8   "might affect the outcome of the suit under governing law[.]" Anderson, 477 U.S. at 248

9   (noting that "the substantive law will identify which facts are material" and that

10  "[f]actual disputes that are irrelevant or unnecessary" in relation to the legal elements of

11  the claims "will not be counted");  SEC v. Seaboard Corp, 677 F.2d 1301, 1306 (9th Cir.

12  1982)("A material issue of fact is one that affects the outcome of the litigation and

13  requires a trial to resolve the parties' differing versions of the truth.")(citation omitted).

14  A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable

15  jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248; see

16  also  Harris, 127 S.Ct. at  1776 ("Where the record taken as a whole would not lead a

17  rational trier of fact to find for the nonmoving party, there is no genuine issue for

18  trial.")(internal quotation marks and citation omitted).

19         Mere reliance on the pleadings and conclusory allegations are insufficient to

20  preclude summary judgment. Celotex Corp., 477 U.S. at 324.  Rather, a party opposing a

21  properly supported motion for summary judgment "must set forth specific facts showing

22  that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (internal quotation

23  marks and citations omitted); see also Harris, 127 S.Ct. at 1776 (the party opposing

24  summary judgment "must do more than simply show that there is some metaphysical

25  doubt as to the material facts")(quoting Matsushita Elec.Industrial Co. v. Zenith Radio

26  Corp., 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)); Celotex, 477

27  U.S. at 324 ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings

28

1   and by [his or] her own affidavits, or [other evidentiary materials] . . . , designate specific

2   facts showing that there is a genuine issue for trial.")(internal quotation marks omitted).

3   Summary judgment may be granted if the evidence favoring the nonmoving party is

4   "merely colorable" or "not significantly probative." <u>Anderson</u>, 477 U.S. at 249-250

5   (citations omitted).

6       In determining whether a triable issue of material fact exists, the evidence must be

7   considered in the light most favorable to the non-moving party. <u>Harris</u>, 127 S.Ct. at

8   1174; <u>Anderson</u>,  477 U.S. at 255 ; <u>Martinez v. Stanford</u>, 323 F.3d 1178, 1184 (9th Cir.

9   2003).  "Credibility determinations, the weighing of the evidence, and the drawing of

10  legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on

11  a motion for summary judgment.  The evidence of the non-movant is to be believed, and

12  all justifiable inferences are to be drawn in his favor." <u>Anderson</u>,  477 U.S. at 255

13  (citation omitted); <u>accord</u> <u>Masson v. New Yorker Magazine, Inc.</u>, 501 U.S. 496, 520, 111

14  S.Ct. 2419, 115 L.Ed.2d 447 (1991)("On summary judgment,. [the court] must draw all

15  justifiable  inferences in favor of the nonmoving party, including questions of credibility

16  and of the weight to be accorded particular evidence.")(citing <u>Anderson</u>)).   However,

17  "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted

18  by the record, so that no reasonable jury could believe it, a court should not adopt that

19  version of the facts for purposes of ruling on a summary judgment motion." <u>Harris</u>, 127

20  S.Ct. at  1776.

21                  **III.  PLAINTIFF'S ALLEGATIONS**

22  **A.**    **EXCESSIVE FORCE**

23      The undisputed facts show that on August 14, 2003, plaintiff was informed by a

24  corrections officer that he was being assigned a Mexican cellmate.   Plaintiff, who is

25  Puerto-Rican,  refused to be celled with a Mexican inmate because of past racial

26  conflicts plaintiff had experienced with Mexican inmates and out of concern for his

27  safety. [FAC 22-24; Pltf. Dec. at ¶ 2.]   As a result of plaintiff's refusal to "double cell,"

28

1   Lieutenant Dottaviano issued plaintiff a CDC 128 "General Chrono"[15] authorizing the

2   confiscation of plaintiff's property. [FAC 23; Opp. Ex. A; Def. Uncontroverted Fact No.

3   4.]   When he reported to work at 6:00 a.m. the next day, August 15, defendant Colunga

4   was informed of plaintiff's refusal to double cell with another inmate,  and of the

5   property restriction. [Colunga Dec. at 4.]  At approximately 6:10 a.m., Colunga ordered

6   defendant Herrera and Correctional Officer Quevedo to confiscate plaintiff's property –

7   including electrical appliances – pursuant to Lt. Dottaviano's authorization.  [Pltf. Dec.

8   at ¶¶ 3, 5; Opp.at 4; Opp. Ex. B (Defendant Colunga's Response To Plaintiff's

9   Interrogatories at page 2).]

10        From this juncture, the parties' version of the ensuing events differ in key respects.

11   1.     Plaintiff's Version:

12        Plaintiff was asleep on his bunk at 6:10 a.m. when Herrera and Quevedo came to

13   his cell door, woke him up, and advised him to "cuff up" so that they could confiscate his

14   property due to his refusal to double cell. . [FAC 23; Opp. at 4; Plft. Dec. at ¶¶ 4- 5.]

15   Plaintiff explained that he had refused to double cell because he wanted to be treated

16   equally to other inmates who were permitted to double-cell with inmates of the their own

17   ethnicity to avoid racial conflict. [FAC 24.]  Plaintiff responded that he was not going to

18   give up his property and asked to speak to a Sergeant. [Plft. Dec. at ¶ 7.]  Herrera left,

19   and returned some time later with Colunga. [FAC 24; Opp. at 4; Plft. Dec. at ¶ 8.]

20   Colunga and Herrera "were apparently upset because plaintiff would not give up his

21   property." [Opp. at 4-5.]   Without provocation, Colunga yelled at plaintiff, stating: "I

23        [15]The General Chrono, dated August 14, 2003,  states: "On Thursday, August 14,
24   2003, at approximately 1700 hours, inmate Garcia [ ... ] refused to accept inmate Alvarez
25   [ ... ] as a cellmate in an Institutional Needs Compaction cell move.  Inmate Garcia was
     given notice [that] any inmate who refuses to voluntarily double cell will have their
26   [e]lectrical [a]ppliances confiscated and forwarded to Receiving & Release.  Once
27   inmate Garcia cooperates with the double cell policy of this institution, his appliances
     will be returned to him. Inmate Garcia is aware of this report." [Opp. Ex. A.]
28

don't think you have the balls to get cell-extracted, and even if you do, I feel sorry for you, because if I have to get a cell-extraction team, we will beat you up, and at the end of the day, I will get your property." [FAC 24; Plft. Dec. at ¶ 8; Opp. at 5.] Plaintiff requested to speak to a Lieutenant; Colunga and Herrera left. [Opp. at 5.] Plaintiff did not cover his cell door with newspapers;[16] nor did he throw any liquid at or toward the officers. [Pltf. Dec. at ¶¶6, 13.]

Thereafter, defendant Dr. Morong spoke to plaintiff. Plaintiff notified Morong that Herrera and Colunga wanted to confiscate his property because plaintiff refused to double-cell with a Mexican inmate, and that Colunga made threats to beat plaintiff up if plaintiff did not give up his property. [FAC 24; Pltf. Dec. at ¶¶ 9-12.] Plaintiff was responsive throughout his conversation with Morong, and never told Morong that he was suicidal, seeing snipers[17] or that he was going to kill his "cellie." [Pltf. Dec. at ¶¶ 9-12.]

Morong and defendant Reed ordered that plaintiff be cell-extracted. [Opp. at 7.] The cell-extraction team included defendants Colunga, Herrera, Juno, and Williamson.

---

[16]Plaintiff contends that defendants possess, and have refused to provide, photographs which will show that his cell door was not covered. [Opp. at 6.] A report apparently completed by Hamlin in connection with the RVR (which lists the photographs Hamlin took of plaintiff) indicates that at least one photograph of plaintiff's cell door was taken by Hamlin after the cell extraction. [See FAC, Ex. S.] Defendants have not, however, either responded to plaintiff's contention nor mentioned or produced any photographs taken by Hamlin other than those of plaintiff's person.

[17]In the FAC, plaintiff alleges that he told Morong that "Correctional Officer Valenzuela control booth operator for Building #4, was pointing a gun rifle and aiming to the plaintiff cell door [sic]." [FAC 25.] This allegation is born out by a handwritten report bearing the name "Michael Valenzuela," which states that on August 15, 2003 at approximately 11:15 a.m., while performing his duties as control booth operator, Valenzuela provided "armed coverage" for plaintiff's cell extraction. [See FAC, Ex. S.]

11

[FAC 25; Pltf. Dec. at ¶¶ 14, 17.][18]  Plaintiff was ordered to lay face down on the floor and place his hands behind his back. [FAC 25; Pltf. Dec. at ¶ 14.]  Plaintiff did as instructed. [Id.]  After plaintiff was face down on the floor, Colunga threw a "T. 16 O.C. grenade" into the cell. [Pltf. Dec. at ¶ 15.]  The cell-extraction team entered plaintiff's cell[19] and physically assaulted and beat plaintiff while he lay face-down on the floor with

_____

[18]It is undisputed that a cell extraction was ordered, that the cell extraction occurred sometime after 11:00 a.m, and that Colunga, Herrera, Juno and Williamson were assigned to the cell extraction team.  Nor does there appear to be a genuine issue of material fact as to the propriety of a cell extraction as a means to effectuate the property restriction order in light of plaintiff's admitted refusal to comply with it.  What is disputed, and materially so, is defendants' justification for conducting an "emergency" cell extraction, and the related question whether the use of force employed to carry it out was justified.

[19]Plaintiff cites a "Rules Violation Report" ("RVR") dated August 16, 2003 and referring to the cell extraction as corroboration for his claim that he was already on the floor when the cell extraction team entered the cell to remove him. [Opp. at 7-8; Opp. Ex. F.]  The one page exhibit – in which plaintiff is accused of attempted assault on a peace officer and which reflects that Juno is the "reporting employee" – states that plaintiff "laid down on the floor" before Juno and the other officers entered plaintiff's cell. [Opp. Ex. F.]

Defendants seek to negate or minimize the import of this statement as "unsworn hearsay," stating that the RVR "is a compilation of the officers' individualized reports." [Def. Reply at 5-6.]  Defendants efforts are unfounded and disingenuous, at best.  As is evident from defendants' own evidence, the RVR is a "compilation" to the extent it reports a complaint against or misconduct by an inmate as well as the official action thereafter taken in response. [See Colunga Dec., Ex. A.]  Indeed, and although defendants themselves have not fully satisfied all the foundation prerequisites to properly admit it into evidence, the RVR in toto has the earmarks of a business record See Fed. Rule Evid. 803(6).  Additionally, the particular page and portion plaintiff cites, and in which the highlighted statement appears, sets forth the "circumstances" upon which the report is based.  The "circumstances" section is written in the first person, after which appears Juno's typewritten name and a signature.  In short, the statement has all the earmarks of non-hearsay. See Fed. Rule Evid. 801(d).  Thus, defendants' apparent

(continued...)

12

1  his hands behind his back. [FAC 25; Pltf. Dec. at ¶17.]  Defendants punched plaintiff in

2  his back, in his butt area, and on the back of his head and legs. [FAC 25-26; Pltfs. Dec. at

3  ¶¶ 17-18; Opp. at 16.]  Defendants also "stumped" on plaintiff's ankles. [Id.]

4  Defendants continued to punch plaintiff on his butt and the back of his legs, and to

5  "stump" his ankles after plaintiff was handcuffed.  [Id.]  Defendants also yanked on the

6

7

8  [19](...continued)
hearsay objection is overruled.

9       Other considerations factor into this determination.  First, the challenged

10  statement is repeated in a different and handwritten document  (a "Crime/Incident Report
    – Supplement") bearing Juno's name and a signature, dated August 15, 2003  [Opp. Ex.

11  C -3], to which no hearsay objection is raised.  Juno neither denies the substance of  nor

12  makes any mention of either reports in his declaration submitted in support of the motion

13  for summary judgment.  Moreover, although dismissive of the highlighted statement in
    the "circumstances" section of the RVR, defendants simultaneously and otherwise adopt

14  the contents of that recitation as consistent with their version of the facts.  [Def. Reply at

15  6.]

16       Second, the statement is flatly inconsistent with, for example, Colunga's
    declaration that the officers entered the cell and were required to use physical force after

17  and because plaintiff ignored repeated orders to get down.  [See Colunga Dec. at 3

18  (stating that he, Juno and Herrera entered the cell after plaintiff ignored repeated orders
    to get down, and that "[d]uring the removal process, plaintiff was struck . . . and he fell

19  to the floor.").]  Indeed, although defendants uniformly contradict plaintiff's claim that

20  he was already on the floor when sprayed with the pepper spray,  Williamson and
    Hamlin both corroborate plaintiff's claim that he was already down when the cell

21  extraction team entered the cell. [See Hamlin Dec. at ¶¶ 4-5 ("I heard officers giving

22  orders for Plaintiff to get on the floor.  After a few minutes, Plaintiff complied with the
    instructions and assumed a prone position on the floor . . . . Sergeant Colunga, Officer

23  Juno and Officer Herrera entered the cell to restrain Plaintiff."); Williamson Dec. at ¶¶ 6-

24  7 ("I again used the MK-46 to spray Plaintiff, and it appeared to have an effect, because
    Plaintiff got down on the ground. . . . . Sergeant Colunga, Officer Juno and Officer

25  Herrera entered the cell in order to put Plaintiff in restraints.").]  In short, the existence

26  of a genuine and disputed issue of material fact as to whether plaintiff complied with

27  orders to get down, thereby calling into question whether and what force was necessary

28  to remove plaintiff from his cell, is evident from defendants' submissions themselves.

13

handcuffs sideways and upwards. [FAC 26; Opp. at 16-17.] Plaintiff was not combative and did not assault or resist the staff; he did not swing his arms upwards or sideways. [Pltf. Dec. at ¶ 16; Opp. at 7, 16.] As a result of the beating, plaintiff suffered bruises and swelling to the back of his head, his buttocks and the back of both of his legs, a swollen and bruised ankle, and lacerations on and swelling of his wrist. He also suffers from continuous neck, back, ankle and wrist pain and headaches, as well as flashback nightmares of the beating. [FAC 26; Pltf. Dec. at ¶¶ 26-27; Opp. at 17.]

Plaintiff was removed from the cell and taken to the medical clinic.[20] At the clinic, defendant Blanco conducted a body injury inspection of plaintiff's upper body, but refused to do a complete inspection of or document all of plaintiff's injuries. [FAC 27; Pltf. Dec. at ¶19; Opp. at 8-9, 17.] Blanco refused to remove plaintiff's sweat shorts, which would have revealed bruises and bumps to plaintiff's buttocks and the back of his legs. [Opp. at 9.][21] Blanco also falsely reported that plaintiff suffered no open wounds or

---

[20]In the FAC, plaintiff alleges that defendants dragged him out of the cell, dragged him along the tier floor, then got on top of his back, placing knees to the back of his head, neck and back. Defendants placed iron leg restraints on plaintiff's legs and escorted him down the tier. [FAC 26-27.] Defendants admit that plaintiff was "pulled" from his cell and "held down" on the tier while leg restraints (irons) were placed on his ankles. [Herrera Dec. at ¶ 14; Juno Dec. at ¶ 8; Colunga Dec. at ¶ 11; Hamlin Dec. at ¶ 5; Williamson Dec. at ¶¶ 7-8.] Defendants allege, and plaintiff does not dispute, that plaintiff was taken to the showers in the yard to be decontaminated with water due to the effects of the pepper spray, after which he was escorted to the medical clinic. [See Herrera Dec. at ¶¶ 15-16; Juno Dec. at ¶¶ 9-10; Colunga Dec. at ¶¶ 11-12; Hamlin Dec. at ¶ 6; Williamson Dec. at ¶ 8.] Plaintiff alleges, and defendants do not dispute, that he was pushed and shoved while being escorted to the medical clinic and placed there in a holding cell. [FAC 26-27.]

[21] Defendants have not submitted a declaration by Blanco. Rather, defendants point out that Blanco has "never been served with this lawsuit" and rely on Colunga's declaration that he observed the exam and that Blanco noted redness on plaintiff's upper chest area due to pepper spray exposure. [Def. Reply at 6 (citing Colunga Dec. at ¶ 12.]

(continued...)

14

swelling. [Id.][22]   Contrary to Blanco's report, a videotape of an interview of plaintiff conducted after the examination shows that plaintiff had open lacerations on and swelling in his wrist, as well as a bruised and swollen ankle. [Opp. at 9, 17-18.][23]

---

[21](...continued)
Colunga's declaration, however, is insufficient to establish personal knowledge of the substance and results of Blanco's examination.  Nor is Colunga's declaration particularly responsive or sufficient to render immaterial plaintiff's specific allegations that Blanco's examination was incomplete and report inaccurate (or for that matter, the additional allegation that Blanco left plaintiff in the holding cell in handcuffs, mechanical restraints, and in pain, as well as refused and ignoring plaintiff's pleas for treatment [FAC 27]).

    According to Hamlin's declaration, he too was present during plaintiff's medical exam, but he says nothing as to what Blanco did or noted or said. [Hamlin Dec.at ¶ 6.] Curiously, what Hamlin does report is that "[d]uring the medical examination, [he] noticed Plaintiff was wearing black gloves on his hands, a blue chambray shirt, a white T-shirt, blue jeans, gray athletic shorts underneath the jeans, and knee pads." [Id.]   To the extent this observation is relevant, it would appear to support plaintiff's claim that the exam was incomplete, as one would be hard pressed to believe a medical examiner could conclusively dispel allegations of bruising and like injuries if the patient remains fully clothed during the examination.

    [22]Plaintiff has submitted a copy of what appears to be Blanco's report of his examination. [FAC, Ex. 2; Opp. Ex. G.]  This document reflects that plaintiff reported to Blanco that "they beat me up . . . my jaws, my nuts, my head, my knees, my whole body" and that Blanco noted bruises/discolored areas and the effects of pepper spray, but no open injury, swollen area., or injuries requiring treatment. [Id.]

    [23]Plaintiff alleges that open injuries on his wrist are visible, and that swelling in his ankle and wrist is evident, in the videotape. [Opp. at 9.]   Plaintiff has urged the court to view the videotape, which has been lodged by defendants.  [Id.]   Defendants similarly urge the court to view the videotape, contending, not surprisingly, that it "shows no visible injuries other than a possible scratch on [plaintiff's] wrist of undetermined age." [Def. Reply at 5.] The court has accepted the parties' invitation and has reviewed the tape. As discussed below, the court finds that the tape does not
(continued...)

15

Although defendants took some photographs of plaintiff after the examination, none were taken of plaintiff's ankles, wrist, buttocks, or the back of plaintiff's legs. [Opp. at 18; See Opp. Ex. M; Hamlin Dec., Ex. A.] [24]

---

[23](...continued)
blatantly support defendants' position and is, at best, inconclusive as to the full extent of plaintiff's injuries.

[24]Although not particularly relevant to resolution of the summary judgment motion, the FAC alleges, and defendants do not dispute, that Defendant Morong then arrived and informed plaintiff that he would be placed on "suicide watch," over plaintiff's objection. Soon after, an ambulance transported plaintiff to the infirmary, where he was placed in a room and prescribed psychiatric medications, but still was refused pain medication or medical treatment for his physical injuries. After two days in that room on a mattress on the floor, defendant Morong prescribed pain medication, x-rays, an ice bag for plaintiff's swelling, and ordered the staff nurse to clean plaintiff's lacerations. Plaintiff remained on suicide watch at the central infirmary from August 15 to August 18, 2003. [FAC 27-28.]

On August 18, 2003, defendants released plaintiff into the general population, then on August 20, 2003, defendant Colunga informed plaintiff that he was being placed in administrative segregation. Approximately one hour later, correctional officer Day escorted plaintiff to the medical clinic, where the staff nurse requested that the correctional officer remove all of plaintiff's clothing to enable the nurse to conduct a body injury report. Officer Day immediately told the nurse that plaintiff had no injuries and refused to remove plaintiff's handcuffs or clothing, noting plaintiff's prior assault on staff. Officer Day also refused the medical technician's request to place plaintiff in a holding cell so that the medical report could be made without a security concern. Correctional Officer Day then signed defendant Colunga's name to the medical report of injury, to cover up his own misconduct. [FAC 28-29.]

Plaintiff was placed in a double cell in administrative segregation and served with a RVR for attempted aggravated assault on staff and resisting staff. On September 3, 2003, prison officials assigned plaintiff an investigator-employee, but that investigator refused plaintiff's requests for: (1) copies of the photographs taken the day of the cell extraction; (2) an opportunity to view the extraction videotape; (3) questions to be posed to officers Herrera and Quevedo; and (4) a staff assistant. [FAC 30.]

Senior hearing officer Sumpter presided over the October 26, 2003 hearing on

(continued...)

16

1    2.    <u>Defendants' Version</u>:

2         Defendants' version of the events differs in material respects.   At about 6:10 a.m.,

3    in the course of conducting rounds and performing a routine security check,   Herrera

4    approached plaintiff's cell door.   Herrera could not see inside because the cell door was

5    covered with newspaper from the inside.   Herrera ordered plaintiff – the sole occupant of

6    the cell – to remove the papers and come to the door so that Herrera could handcuff him.

7    Plaintiff responded, "I am not coming out, call the Sergeant." [Herrera Dec. at ¶¶ 4-5.]

8         Herrera telephoned  (Sergeant) Colunga and informed him of the situation.   A few

9    minutes later,  Colunga arrived and asked Herrera to open the food port of plaintiff's

10   cell.  Colunga asked plaintiff what the problem was. [Herrera Dec. at ¶ 6; Colunga Dec.

11   at ¶ 4.][25]  Colunga and Herrera attempted to look through the small food port opening.

12   Herrera saw plaintiff holding a tobacco can with something in it, as if he intended to

13   "gas" them (i.e., throw liquid on them); Colunga saw plaintiff stand up and throw an

14   unknown liquid substance toward the officers.  Colunga immediately closed the food

15

16   ────────────

17        [24](...continued)
     plaintiff's RVR.  Plaintiff entered a "not guilty" plea and informed defendant Sumpter
18   that he did not do any of the things reflected in the incident reports prepared by the
     correctional officers.  Plaintiff explained that a review of the videotape of the incident
19   would reveal that plaintiff had not resisted and that defendants had beaten him.
     Although defendant Sumpter signaled his intention to view the videotape, he did not do
20   so, explaining that due to problems with the officers' incident reports, he would reduce
21   the charge against plaintiff to "resisting staff."  Accordingly, based on a preponderance
     of the evidence presented at the hearing, plaintiff was found guilty of the lesser included
22   charge of "force and violence for the specific act of resisting staff."  Defendant Sumpter
23   assessed no loss of behavior or work credits, counseled and reprimanded plaintiff, and
     referred plaintiff to the "ICC" (presumably "Inmate Classification Committee") for
24
25   Program Review.  [FAC 31; Ex. S (Rules Violation Report, Part C).]

26        [25]Although Herrera states that plaintiff did not respond, Colunga does not so
27   indicate, stating only that he "attempted to communicate with Plaintiff by asking him
28   what the problem was." [Herrera Dec. at ¶ 6; Colunga Dec. at ¶ 4.]

1 port and went to inform his supervisor of the situation.   [Id.]

2       After being notified by Colunga of plaintiff's conduct, defendant (Captain) Reed

3 reported to the unit and "confirmed" the situation.  Reed requested that the Security

4 Squad perform a calculated use of force cell extraction, "which involves lengthy

5 planning and videotaping of the extraction."[26]  Reed requested that Morong review

6 plaintiff's medical file to determine whether any medical concern precluded use of

7 pepper spray on plaintiff during the cell extraction. [Reed Dec. at ¶ 4.]

8       That morning, at about 10:30 or 11:00 a.m.,  Morong received a call from

9 Colunga, who informed  Morong that plaintiff had boarded up his cell door and refused

10 to be handcuffed.  Colunga asked  Morong to review plaintiff's medical file to determine

11 if pepper spray could be used on plaintiff during a cell extraction.

12       Morong responded to the unit to speak to plaintiff and review his medical file.  He

13 determined that nothing precluded the use of pepper spray on plaintiff. [Morong Dec. at

14 ¶¶ 3-4.]  Upon receipt of Morong's determination, at approximately 11:00 a.m.,  Reed

15 contacted and obtained authorization from the Associate Warden to perform a calculated

16 cell extraction of plaintiff.  [Reed Dec. at ¶¶ 4-5.]

17       During his review of plaintiff's medical file, Morong was concerned about

18 plaintiff's serious psychiatric history, which included a previous suicide attempt by

19 hanging, other indications of previous suicidal and homicidal ideations, a diagnosis of

20 paranoid schizophrenia, and current prescriptions for psychotropic medications.

21

---

22    [26]In their answers to interrogatories propounded by plaintiff, defendants refused –

23 citing confidentiality and security concerns –to explain or set out the policy, guidelines,

24 and procedures  in planning and executing a cell extraction, other than to state that
emergency cell extractions are not videotaped. [See Opp. Ex. B (Colunga's Responses to

25 Plaintiff's Interrogatories Nos. 11-12;  Reed's Responses to Plaintiff's Interrogatories

26 Nos. 8-9.]   The court affirmed defendant's refusal, noting that "[t]he issue in this case is
whether Defendants violated the Eighth Amendment by using excessive force while

27 extracting Plaintiff from his cell, not whether they violated CDCR policies and

28 restrictions." [Minute Order of October 11, 2007 at 8 n. 1.]

1  Morong did a suicide risk assessment on plaintiff, determined that he was at a moderate
2  risk of suicide and that he should be admitted on an emergency basis to the mental health
3  clinic. [Morong Dec. at ¶ 5.]

4      At about 11:00 a.m., Morong spoke to plaintiff. Plaintiff's cell door was covered
5  with newspapers.[27] Plaintiff said "there are snipers out there who want to kill me" and
6  indicated that he would kill any inmate that would be put in a cell with him." Plaintiff
7  gave Morong a copy of an old chrono from a different prison which noted that plaintiff
8  should be single-celled because he was an imminent threat to the institution. Plaintiff
9  subsequently became non-responsive ("selective mutism") and refused to communicate
10 with him or the staff.

11     Due to psychiatric reasons, Morong requested that the staff conduct an emergency
12 cell extraction. At the time, Morong was aware of plaintiff's refusal to accept a cell
13 mate, but was not aware of his property restriction status. Based on his review of
14 plaintiff's medical file and his interaction with plaintiff, Morong believed that an
15 emergency cell extraction should be done to ensure plaintiff's well-being, after which
16 Morong planned to admit plaintiff to the infirmary on a suicide watch. Morong was
17 concerned that plaintiff would commit suicide if he was not extracted immediately, and
18 that plaintiff posed a danger to others because of his threat to kill any inmate he was
19 housed with. [Morong Dec. at ¶¶ 7-9.] Upon Morong's request, an emergency cell
20 extraction was authorized.[28]

21

---

22     [27]Morong's progress notes regarding his evaluation of plaintiff on August 15, 2003
23 indicates that plaintiff could be seen (shadows) walking around the cell. [Morong Dec.,
24 Ex. B.]

25     [28]Defendants are uniform in their contention that the cell extraction executed was
26 an "emergency" conducted at Morong's request as a result of his psychiatric assessment
27 of plaintiff's history and conduct. [See Reed Dec. at ¶ 6; Colunga Dec. at ¶ 6; Herrera
Dec. at ¶ 8.] Although plaintiff does not dispute that Morong reviewed his medical file,
28                                                          (continued...)

[28](...continued)
he contends that Morong used the file and a previous incident in it "as a vehicle to create and falsify a story" justifying the cell extraction. [Opp. at 6-7.]   As noted above, plaintiff specifically denies that he made the statements attributed to him by Morong or that he was unresponsive, and contends that he told Morong about the property restriction and his refusal to double cell with a Mexican inmate and that Colunga had threatened to beat him up. [Pltf. Dec. at ¶¶ 9-12.]   Plaintiff also notes that he was double-housed only two days after discharge from the suicide watch while still in "5 day step down" and that "the procedures of follow-up for suicide inmates is to keep those inmates on single cell status till after the follow up process of the 5 days step down watch." [Opp. at 10.] Defendants do not dispute either contention. [Def. Reply at 6 (but taking plaintiff to task for not providing "a copy of any regulation violated by placing him with a cell mate during the 5-day 'step down' process.").]   Plaintiff contends that if Morong's report "was legit," Morong would never have allowed Plaintiff to be double-celled while still in "step down." [Opp. at 10.]   Defendants do not specifically dispute this contention. Rather, their apparent response – surprising given Morong's opinion that emergency intervention was necessary because Plaintiff posed a danger to himself as well as others – is that "it is not clear how housing Plaintiff with a cell mate [during the 5-day step down process] would make him more suicidal; indeed, another person might provide comfort or notify authorities in the event of an attempted suicide." [Def. Reply at 6.] Plaintiff also takes issue with the conclusion that an "emergency" existed as inconsistent with other facts alleged by defendants.  There is some support in defendants' evidence for this contention.  In this regard, defendants' evidence shows that Morong was contacted at or after 10:30 a.m., over four hours after Herrera's alleged discovery at 6:10 a.m. that plaintiff's door was covered from the inside with newspaper ( as a result of which Herrera "could not see inside to verify that Plaintiff was present and safe"), plaintiff 's attempt to "gas" Herrera and Colunga, and his refusal to comply with orders. [Herrera Dec. at ¶ 4; Colunga Dec. at ¶ 4; Morong Dec. at ¶3.]  These circumstances prompted defendant Reed to seek and obtain approval for a calculated use of force extraction, which requires "lengthy planning " and is videotaped. [Reed Dec. at ¶¶ 3-4.]   The passage of time, and resort to a procedure that requires "lengthy planning," suggests that plaintiff's purported conduct and recalcitrance – including covering his cell door and refusing to comply with orders – was not considered or perceived by the on-site staff as presenting any emergency, even though Colunga, in particular, claims pre-cell extraction knowledge of plaintiff's psychiatric history and the fact that he was presently

(continued...)

1   Colunga supervised the cell extraction team, which was summoned at

2   approximately 11:15 a.m. to respond to plaintiff's cell.  The assembled team included

3   defendants Juno, Williamson, Herrera and Officer Day. [Colunga Dec. at ¶ 7.]  Juno was

4   assigned as the shield man; Williamson was assigned to use an MK-46 O.C. pepper

5   spray container, and  Herrera was assigned as the handcuff officer.  [Juno Dec. at ¶ 3;

6   Williamson Dec. at ¶ 3; Herrera Dec. at ¶ 9.]   Because it was an emergency cell

7   extraction, it was not videotaped. [Reed Dec. at  ¶ 6.][29]

8

9   _____

    [28](...continued)

10  taking medications.  [See Colunga Dec. at ¶ 5(stating that "[d]ue to Plaintiff's psychiatric

11  history and the medications he was taking, medical clearance had to be obtained before

    pepper spray could be used.  Dr. Morong was located and Plaintiff's medical file was

12  also obtained."); see also Reed Dec. at ¶ 4 (stating that "[a]t my request, Dr. Morong

13  reviewed Plaintiff's medical file and determined that nothing precluded the use of O.C.

    pepper  spray on Plaintiff.").]

14

15  [29] Plaintiff is persistent in his contention that the cell extraction was videotaped.

16  [Pltf. Dec. at 20.]  Without doubt, a video tape of the cell extraction could prove useful

    in resolving whether excessive force was used.  Moreover, withholding or the

17  destruction of any such video by defendants – as plaintiff contends – would be probative

18  of a conspiracy to cover-up use of excessive force.   Defendants are equally persistent in

    their assertion that "the cell extraction was not videotaped because it was an emergency

19  and not a calculated procedure." [Def. Reply at 3-4.]   Absent a "smoking gun" video,

20  resolution of this dispute boils down to weighing  the credibility of the witnesses, which

    the court cannot do.

21       Moreover, the fact that internal procedures do not require videotaping of

22  emergency cell extractions sheds little light on whether the extraction in this case was in

23  fact an emergency.  In this respect, whether or not the procedure could or should have

    been videotaped, but was not, is not inconsequential.  The likely assumption that the

24  emergency nature of a procedure renders videotaping impractical or impossible would

25  not reasonably follow from the evidence before the court.  Defendants' evidence shows

    that a calculated cell extraction had been decided upon in response to plaintiff's

26  recalcitrance and conduct and was being planned well before  Dr. Morong entered the

27  picture and subsequently declared an emergency.  A well equipped cell extraction team,

28                                                                                           (continued...)

21

1    In addition to being covered with newspapers, plaintiff's door was obstructed so
2    that it could not be opened remotely by the control booth operator. [Williamson Dec. at
3    ¶ 4.]  Plaintiff did not comply with Colunga's orders to "cuff up" by putting his hands
4    out of the food port. [Colunga Dec. at ¶ 7; Herrera Dec. at  ¶ 10;  Williamson Dec. at ¶
5    5.] Maintenance staff present used a bar box key to manually unlock and open the door.
6    Officer Day grabbed and forced open the cell door.  [Colunga Dec. at ¶ 8; Herrera Dec.
7    at  ¶ 11;  Williamson Dec. at ¶ 5; Juno Dec. at ¶ 5.]

8    As the door was opened, plaintiff threw an unknown liquid substance at Defendant
9    Juno, striking his shield. [Colunga Dec. at ¶ 8; Herrera Dec. at ¶ 11;  Williamson Dec. at
10   ¶ 6; Juno Dec. at ¶ 5; Hamlin Dec. at ¶ 4.]    Colunga tossed a CD T-16 O.C. grenade into
11   the cell to disperse pepper spray, and ordered plaintiff to get down.  [Colunga Dec. at ¶
12   8; Hamlin Dec. at ¶ 4.]  Williamson also ordered plaintiff to get down, and fired pepper
13   spray at plaintiff's facial area in an effort to get plaintiff to comply. [Williamson Dec. at
14   ¶ 6; Colunga Dec. at ¶ 8.]   Plaintiff backed up but did not get down on the floor, so
15   Williamson sprayed him with pepper spray again. [Williamson Dec. at ¶ 6.]

16   According to Williamson, "the pepper spray appeared to have an effect because
17   plaintiff got down on the floor." [Williamson Dec. at ¶ 6; accord Hamlin Dec. at ¶ 4
18   (stating that he "heard officers giving orders for Plaintiff to get on the floor" and that
19   "[a]fter a few minutes, Plaintiff complied with the instructions and assumed a prone
20   position on the floor due to the effects of the O.C. pepper spray.").]   Colunga, on the
21   other hand, makes no mention of any effect by the pepper spray, stating that plaintiff
22   continued to refuse to comply with repeated orders to get down, and that plaintiff fell
23   onto the floor after being struck with the shield during the removal process.  [Colunga
24
25
26        [29](...continued)
     each member of whom had a designated role, promptly assembled and was ready to
27   proceed  when summoned.  Short notice -- that might justify the failure to summon and
28   position a video camera operator – simply does not factor in this scenario.

1  Dec. at ¶¶ 9-10.] [30]

2      Colunga, Juno and Herrera entered the cell to physically remove plaintiff.

3  [Colunga Dec. at ¶ 9; Herrera Dec. at ¶ 12;  Williamson Dec. at ¶ 7; Juno Dec. at ¶ 6;

4  Hamlin Dec. at ¶ 5.]   Williamson remained outside. [Williamson Dec. at ¶ 7; Hamlin

5  Dec. at ¶ 5 .]  Juno placed the shield on plaintiff's back in order to control him.

6  [Herrera Dec. at ¶ 13; Juno Dec. at ¶ 7.]   Plaintiff became hostile and combative,

7  attempting to hit and kick the officers. [Colunga Dec. at ¶ 9 ("Plaintiff attempted to

8  strike me with his left hand . . . and . . . attempted to kick Officer Juno."); Herrera Dec. at

9  ¶ 13 ("Plaintiff was being hostile and combative by trying to turn over, kicking and

10  swinging upward in an effort to strike us."); Williamson Dec. at ¶ 7 ("Plaintiff became

11  combative and tried to hit Sergeant Colunga, Officer Juno, and Officer Herrera with his

12  fists."); Juno Dec. at ¶ 7 ("Plaintiff was being hostile and combative by trying to turn,

13  kicking and swinging his arms upward in a effort to strike us and resist being

14  handcuffed."); Hamlin Dec. at ¶ 5 ("Plaintiff started to resist by attempting to hit and

15  kick the officers as they were attempting to place handcuffs on him.").]  Colunga

16  grabbed  plaintiff's left hand and arm and placed it behind plaintiff's back; Herrera did

17  the same with plaintiff's right arm and hand and was able to handcuff plaintiff; Juno

18

---

19      [30]A clear inference can be drawn from Williamson and Hamlin's declarations that

20  plaintiff was on the floor before the extraction team entered plaintiff's cell – either in

21  compliance with orders to do so,  as a result of the effects of the pepper spray, or both.
   This inference is consistent with Juno's reports after the incident, which state that

22  plaintiff was lying on the floor face down when the extraction team entered the cell.

23  [See Opp. Exs. C-3;  F.]  The opposite inference (that plaintiff was not in any way
   responsive to initial measures to render him compliant), however, can be reasonably

24  drawn from Colunga's declaration  – namely, that plaintiff was upright when the officers

25  entered and was brought to the floor after being struck with shield.   Defendants do not
   clarify or explain this material inconsistency.   Instead, they make an incongruous

26  assertion  – unrelated to whether plaintiff was compliant before force was used – that

27  plaintiff cannot identify who did what to him because he was "allegedly" face down

28  during the incident.  [Def. Reply at 3.]

1   grabbed and held plaintiff's legs. [Colunga Dec. at ¶ 10; Herrera Dec. at ¶ 13;

2   Williamson Dec. at ¶ 7; Juno Dec. at ¶ 7; Hamlin Dec. at ¶ 5.]    According to Hamlin,

3   "[t]he staff had to momentarily wrestle with Plaintiff in order to get him handcuffed."

4   [Hamlin Dec. at ¶ 5.]

5           Juno and Herrera pulled plaintiff out of the cell. [Herrera Dec. at ¶ 13; Williamson

6   Dec. at ¶ 7; Juno Dec. at ¶ 8; Hamlin Dec. at ¶ 5.]    Plaintiff was held down and

7   restrained on the tier while Juno placed leg restraints on plaintiff's ankles. [Colunga

8   Dec. at ¶ 11; Herrera Dec. at ¶ 14; Williamson Dec. at ¶ 8; Juno Dec. at ¶ 8; Hamlin Dec.

9   at ¶ 5.]    Plaintiff was helped to his feet and placed against a wall,  after which Juno

10  conducted a clothed body search – with negative results – for weapons or contraband.

11  [Herrera Dec. at ¶ 14; Juno Dec. at ¶ 8; Hamlin Dec. at ¶ 5.]

12          Plaintiff was escorted by Juno and Herrera to an outside shower where he was

13  decontaminated from the effects of the pepper spray with cold running water. [Herrera

14  Dec. at ¶ 15; Juno Dec. at ¶ 9.]    After decontamination, plaintiff was escorted to

15  Medical Technical Assistant defendant Blanco's office for a medical examination.[31]

16  During the examination, Hamlin noticed that plaintiff "was wearing black gloves on his

17  hands, a blue chambray shirt, a white t-shirt, blue jeans, gray athletic shorts underneath

18  the jeans, and knee pads. [Hamlin Dec. at ¶ 6.]

19          After the medical examination was completed, at approximately 11:30 a.m.,

20  defendant Hamlin took photographs of plaintiff. [Hamlin Dec. at ¶ 7, Ex. A thereto.]

21  Plaintiff was wearing only his gray athletic shorts.  Plaintiff did not point out to Hamlin

22  any additional areas to photograph, nor did plaintiff request to remove his shorts while

23

24

25

---

26      [31]Colunga declares that "MTA Blanco noted redness to Plaintiff's upper chest area
    from exposure to pepper spray." [Colunga Dec. at ¶ 12.]    As discussed below,
27  Colunga's declaration does not establish personal knowledge of  Blanco's examination.
    [See footnote 19, supra..]
28

24

1   being photographed. [Hamlin Dec. at ¶¶ 7-8.][32]   Lieutenant Cox interviewed plaintiff on
2   videotape after the medical examination. [See lodged videotape.]   Williamson was the
3   camera operator during the interview, which took place at approximately 12:30 p.m.
4   [Williamson Dec. at ¶ 11.]   Plaintiff was then taken to the Critical Treatment Center by
5   emergency transport and placed in a mental health bed and on suicide watch.   [Colunga
6   Dec. at ¶ 13.]

7        Defendants uniformly contend that the force used by the cell extraction team was
8   "reasonable and  necessary" in order "to restrain Plaintiff, effect custody, and gain his
9   compliance" after he threw liquid at staff and refused to comply with repeated orders to
10   "cuff up," that their "intentions were to restrain Plaintiff and restore order[;]" and that
11   use of excessive force would have been stopped and reported had it occurred.
12   [Williamson Dec. at ¶¶ 9-10; Herrera Dec. at  ¶¶ 17-18; Juno Dec. at ¶¶ 11-12; Hamlin

13

14        [32]The photographs submitted depict front and side shots of plaintiff sitting down
15   on a bench with his hands behind his back, close -up shots of the sides and top of  his
     head, and plaintiff's back from the waist/elbows  up.  [Hamlin Dec., Ex. A (color
16   copies); Opp. Ex. M (black and white copies).]   Plaintiff points out that none of the
     photographs taken by Hamlin depict plaintiff's wrists, ankles, buttocks or the backs of
17   plaintiff's legs, where he alleges he sustained injuries, and that the failure to do so is
18   indicative of defendants' refusal to document his injuries and efforts to cover-up their
     use of excessive force. [Opp. at 18.]   Defendants' counter that plaintiff did not
19   specifically request Hamlin to take photographs of these areas and state that "[i]t is
20   patently unfair for Plaintiff to stand mute while being photographed, only to later
     complain that the photographs were not sufficiently thorough." [Def. Reply at 4.]
21   Defendants' apparent effort to place the onus on plaintiff to himself ensure that his
22   injuries were properly documented is unpersuasive and unreasonable under the
23   circumstances.  Defendants do not dispute that plaintiff reported injuries to his ankle,
     wrist, buttocks and legs to Blanco.  Hamlin photographed plaintiff after Blanco
24   completed his examination for the stated  purpose of "document[ing] any injuries."
25   Hamlin does not state how he determined what to photograph or not to photograph.
     More fundamentally, it is not clear what right plaintiff had to demand that additional
26   photographs be taken; nor does Hamlin say that he would have complied with any such
27   request had plaintiff made one.
28

1  Dec. at ¶ 9; Colunga Dec. at ¶¶ 14-16.]

2  **B.   RETALIATION**

3      With few exceptions noted below, the factual allegations pertinent to the

4  retaliation claim are undisputed.  Prior to his incarceration, plaintiff was the victim of

5  two different gun shot wounds to the front and back of his right knee cap, as a result of

6  which plaintiff experiences pain when he walks or climbs.  Plaintiff also suffers from

7  "lumbar spine degenerative osteophytes," which causes him persistent lower back and

8  leg pain, and pain when he walks, coughs, bends, climbs or stands for a period of time

9  [FAC 49-50; Opp. at 24-25; Exs. N, O; Fortaleza Dec. at ¶3.]

10     Defendant Dr. Fitter is the Chief Medical Officer ("CMO") at Lancaster State

11 Prison ("CSP-LAC") were plaintiff is an inmate.  As such, he supervises all staff

12 physicians and psychologists, medical technical analysts, and other medical personnel at

13 the institutions's Clinical Treatment Center, as well as outlying medical clinics on the

14 facilities.  As the CMO,  Fitter does not typically review the medical decisions made by

15 staff unless a question or allegation is raised.   In 2004, defendant Dr. Fortaleza was one

16 of the staff physicians whom  Fitter supervised. [Fitter Dec. at ¶¶ 3, 10; see also Opp. Ex.

17 B [Defendant J. Fitter's Response to Plaintiff's First Set of Interrogatories, Response to

18 Interrogatory No. 23, at page 9 (stating that "primary care physicians decide treatment

19 for a patient's medical condition.").]

20     When plaintiff  was originally received by the California Department of

21 Corrections ("CDC") on March 13, 1994, he was prescribed restricted, light duty and

22 lower bunk housing chronos  as a result of the above conditions.  [FAC 49-50; Opp. at

23 25; Ex. P.]  Most "chronos' referring to medical conditions are issued for a specified

24 term, i.e., are  temporary, rather than  permanent,  requiring inmates to seek their renewal

25 upon expiration.  [FAC 51.][33]   Prior to February 5, 2004, CDC physicians had continued

26

27     [33]An adverse decision can be "appealed" by filing a grievance. [Fitter Dec. at ¶ 4.]

28                                                                                     (continued...)

1  plaintiff's lower bunk chrono, the light physical duty restriction, and prescribed pain

2  medication. [FAC 50-52; Opp. Ex. P; Mallory Dec. at ¶ 8, Ex. A (indicating that with

3  few exceptions and for relatively short periods, plaintiff was assigned to a lower bunk or

4  a single cell from August 5, 1998 to August 9, 2007.]   In addition, plaintiff was

5  provided with a knee brace. [Opp. Ex. R.]

6        On  February 5, 2004, plaintiff was seen by Fortaleza.   Plaintiff explained his

7  medical conditions to Fortaleza and requested that the previously issued chronos be

8  renewed.[34]  Fortaleza examined plaintiff and refused to renew any of the medical

9  chronos, stating that there was no indication that plaintiff needed anything.  Fortaleza

10

11 ─────────────────────

12     [33](...continued)
   Plaintiff has submitted copies of two grievances filed against defendant Fitter in 2002.
13 In the first, dated April 4, 2002, plaintiff complains that Fitter was extremely rough
   while examining plaintiff's right knee, that Fitter exasperated the pain in plaintiff's right
14 knee and refused to prescribe pain medication. [Opp. Ex. Q.]   In the second, dated
15 December 20, 2002, plaintiff similarly complains of  Fitter's rough handling as well as
   Fitter's  refusal to order a knee brace for plaintiff. [Opp. Ex. R.]  In each instance,
16 plaintiff's medical appeal was partially granted: as to the first, his pain medication was
17 continued [Opp. Ex. Q] ; as to the second, plaintiff was provided a knee brace. [Opp. Ex.
   R.]  Otherwise, plaintiff's complaints about  Fitter's excessive, rough and unprofessional
18 conduct were rejected. [Id.]   In addition, plaintiff has submitted a copy of another
19 grievance he filed against Fitter, dated June 11, 2003, which appears to accuse  Fitter and
   others of failing to inform plaintiff of the results of certain lab reports indicating a
20 medical condition and failure to treat that condition (but is not clear what results or
21 condition), as well as a pattern of misconduct in retaliation for plaintiff's prior
   grievances. [Opp. Ex. S.]   No documentation as to the outcome of this grievance is
22 submitted.
23

24     [34]In his declaration in support of the summary judgment motion, Fortaleza states
25 that plaintiff requested a soft shoe chrono and knee brace for his right knee, but not a
   lower bunk or light/restricted duty chrono. [Fortaleza Dec.at ¶ 5.]   Other defense
26 evidence indicates, however,  that at the time or in connection with that examination,
27 plaintiff did request that all chronos be renewed, including a lower bunk chrono.  [See
   Fitter Dec. at ¶6; Fortaleza Dec., Ex. D.]
28

informed plaintiff that he could appeal his decision, "like you always appeal everything else." [FAC 52; Opp.at 25-26.]

Plaintiff filed a grievance against Fortaleza on February 11, 2004, requesting that all chronos be renewed as soon as possible and requesting an MRI. [FAC 53; Opp. at 26, Ex. T; Fortaleza Dec. Ex. D; Fitter Dec. at ¶6.]  The grievance was rejected by a Medical Appeals Analyst at the informal level on February 25, 2004. [Fortaleza Dec. Ex. D; Fitter Dec. at ¶6.]  Nevertheless, in apparent response to plaintiff's complaints, on February 27, 2004, plaintiff was referred to, and examined by a podiatrist, Dr. Kwan.  At Dr. Kwan's recommendation, Fortaleza signed off on a one-year soft shoe chrono for plaintiff. [Fortaleza Dec. at ¶5;  Ex. C, D.] [35]

Plaintiff pursued his appeal to the next level, contending that his medical conditions were unchanged and not temporary, and that Fortaleza's decision to discontinue rather than renew the chronos[36] was negligent and in retaliation for plaintiff's prior complaints against medical staff.  [Fortaleza Dec., Ex. D.] The written record indicates in response to plaintiff's appeal indicates that plaintiff met on March 23, 2004 with Staff Physician Dr. Echendu, and that on March 24, 2004, Dr. Echendu issued a medical chrono stating that "[f]or medical reasons, [plaintiff] shall be allowed to wear a knee brace" and that "[t]his chrono is valid for the duration of his stay at CSP-LAC."

---

[35]Fitter makes no mention in his declaration before this court of Dr. Kwan's medical assessment, which appears directly contrary to the determination of the staff Medical Appeals Analyst (which determination Fitter does cite) at least with respect to the soft shoe chrono. [See Fitter Dec. at ¶ 6.]

[36]Defendants have not submitted a declaration by Dr. Kwan.  Nevertheless, the record indicates that on February 27, 2004, Fortaleza signed a soft shoe chrono, good for one year, after Dr. Kwan examined plaintiff.  [Fortaleza Dec. Ex. D.] It is not clear from the record whether plaintiff had received this chrono, as he continued to request soft shoes in his March 7, 2004 appeal. [Id.]  Fortaleza subsequently signed a soft shoe chrono on March 26, 2004. [Fortaleza Dec. at ¶ 6; Ex. D.]

1  [Id.][37]   A report dated April 12, 2004, signed by Dr. Echendu and Staff Physician J.

2  Singh, "partially grants" plaintiff's appeal based "on all available information," stating

3  that:

> "Dr. Echendu . . . interviewed [plaintiff] in person to allow him the opportunity to
> fully explain his appeal.  Dr. Echendu notes that the [plaintiff's] examination and
> review of his Unit Health Record were completed. There is no medical indication
> [at this time] that the [plaintiff] requires a lower bunk/lower tier chrono or a
> restricted duty chrono.  He was issued a knee brace and already has a soft-shoe
> chrono."

10  [Id.]

11      Plaintiff persisted in his request for lower bunk and restricted duty chronos, and

12  for an MRI, as well as in his claim that  Fortaleza was negligent, deliberately indifferent

13  to his medical needs, and that he was being retaliated against because of his complaints

14  about Fortaleza and others.  The report responding to plaintiff's appeal at the next,

15  "second," level indicates that plaintiff believed an MRI would substantiate his need for

16  the chronos.   That report, dated May 27, 2004 and signed by  Fortaleza and Fitter, notes

17  that

> [a]ll submitted documentation and supporting arguments have been carefully
> reviewed and evaluated according to departmental policies and institutional
> procedures.  Review of the [plaintiff's] x-ray results of September 16, 2003 does
> not substantiate the [plaintiff's] claims.  There is no medical indication that the
> [plaintiff] requires an MRI. . . . .  Based on all available information and the
> requested action, this appeal is denied at this level in that the medical
> documentation and examination do not support the [plaintiff's] requests.

---

[37]Defendants have not submitted a declaration by Dr. Echendu or Dr. Singh.

1  [Id.] [38]

2       Plaintiff unsuccessfully appealed to the third, and final, Director's level of review.
3  [Id.] The Director's decision, dated September 2, 2004, recounts the determinations
4  noted above and concludes that plaintiff has received medical care in accordance with
5  departmental regulations.  The decision notes that plaintiff had not provided sufficient
6  evidence to support his claims, and that departmental regulations establish that only
7  qualified medical staff is permitted to diagnosis medical conditions and prescribe
8  mediation or treatment for inmates.  The decision also concludes that "it is evident that
9  institutional medical staff are providing the [plaintiff] adequate medical attention." [Id.]

10      Plaintiff further alleges that in retaliation for his pursuit of the above grievances,
11  Fortaleza allegedly falsely documented that plaintiff had been exposed to tuberculosis, as
12  a result of which plaintiff was x-rayed twice and re-tested for tuberculosis.  The test
13  results were negative. [FAC 54.]  In response,  Fortaleza admits that chest x-rays taken
14  of plaintiff on May 4 and July 13, 2004, both showed clear lungs. [Fortaleza Dec. at ¶¶
15  8-9.]  Dr. Fortaleza states that he saw plaintiff on July 13 "for a history of a positive
16  PPD (TB skin test)," that plaintiff disputed that the test was positive, that a repeat test
17  was done at plaintiff's request, and that the repeat test was negative. [Id.]

18      Finally, plaintiff alleges that  Fitter, as the Chief Medical Doctor, failed to take
19  disciplinary action against  Fortaleza after being informed of his misconduct through
20  plaintiff's grievances. [Id.]   Fitter and Fortaleza deny plaintiff's claims of retaliatory

21

22      [38]Fitter states in his declaration before this court that "I signed the second-level
23  appeal response on May 27, 2004, noting that Plaintiff's x-ray of September 16, 2003 did
    not support his claims.  I also did not feel an MRI was warranted based on the results of
24  Plaintiff's medical exams and his x-ray results." [Fitter Dec. at ¶ 8.]  Somewhat
25  inconsistently, Fitter elsewhere states that "I did not refuse to renew Plaintiff's medical
    chronos.  I did not have knowledge of Plaintiff's alleged gun shot wounds to his right
26  knee, and was also unaware that Plaintiff allegedly suffers from a degenerative spinal
27  condition." [Opp. Ex.  B (Defendant J. Fitter's Response to Plaintiff's First Set of
28  Interrogatories, at page 4 (Response to Interrogatory No. 6)).]

1   conduct or that the decisions made were for other than medical reasons. [Fitter Dec. at

2   ¶11; Fortaleza Dec. at ¶10.]

3                                    **V.  SECTION 1983**

4        "To sustain an action under section 1983, a plaintiff must show (1) that the

5   conduct complained of was committed by a person acting under color of state law; and

6   (2) that the conduct deprived the plaintiff of a federal constitutional right." Hydrick v.

7   Hunter, 500 F.3d 978, 987 (9th Cir. 2007), quoting Wood v. Ostrander, 879 F.2d 583,

8   587 (9th Cir. 1989).   "A person deprives another of a constitutional right, where [he or

9   she] does an affirmative act, participates in another's affirmative acts, or omits to

10  perform an act which [he or she] is legally required to do that causes the deprivation of

11  which complaint is made." Hydrick, 500 F.3d at 988 (internal quotation marks and

12  citation omitted).[39] "[P]ersonal participation is not the only predicate for section 1983

13  liability.  Anyone who 'causes' any citizen to be subjected to a constitutional deprivation

14  is also liable.  The requisite causal connection can be established not only by some kind

15  of direct personal participation in the deprivation, but also by setting in motion a series

16  of acts by others which the actor knows or reasonably should know would cause others

17  to inflict the constitutional injury." Johnson v. Duffy, 588 F.2d 740, 743-744 (9th Cir.

18  1978).  Moreover, "a supervisor is liable for the constitutional violations of subordinates

19  'if the supervisor participated in or directed the violations, or knew of the violations and

20  failed to act to prevent them." Hydrick, 500 F.3d at 988, quoting Taylor v. List, 880 F.2d

21  1040, 1045 (9th Cir. 1989).

22                                **VI.  EXCESSIVE FORCE**

23        It is long established that  "the unnecessary and wanton infliction of pain . . .

24  constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson

25  _____

26      [39]Verbal harassment or abuse, alone, is insufficient to state a claim under § 1983.

27  Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987)(concluding that verbal

28  harassment or abuse does not rise to the level of a constitutional deprivation).

1    v. McMillan, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)(quoting Whitley v.

2    Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)(additional citation

3    omitted).  The use of excessive force against inmates falls within this prohibition.  Farmer

4    v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), citing Hudson

5    v. McMillan, 503 U.S. at 6-7;  Whitley, 475 U.S. at 321; Clement v. Gomez, 298 F.3d

6    898, 903 (9th Cir. 2002)("When prison officials use excessive force against prisoners,

7    they violate the inmates' Eighth Amendment right to be free from cruel and unusual

8    punishment.").  Force in this context means force applied maliciously or sadistically,

9    rather than in a good faith effort to maintain or restore discipline.  Hudson v. McMillan,

10   503 U.S. at 6-7;  Whitley, 475 U.S. at 321 (whether a particular use of force inflicted

11   unnecessary and wanton pain turns on "whether the use of force could plausibly have

12   been thought necessary" or "instead evinced such wantonness with respect to the

13   unjustified infliction of harm as is tantamount to a knowing willingness that it occur");

14   Clement, 298 F.3d at 903 ("under the Eighth Amendment, we look for malicious and

15   sadistic force, not merely objectively unreasonable force").

16        Under this standard, not "every malevolent touch by a prison guard gives rise to a

17   federal cause of action."  Hudson, 503 U.S. at 9.  By the same token, neither does the

18   Eighth Amendment require proof of "some arbitrary quantity of injury."  Id.  "When

19   prison officials maliciously and sadistically use force to cause harm, contemporary

20   standards of decency [which give meaning to the Eighth Amendment] always are

21   violated . . . . whether or not significant injury is present."  Id. at 9-10 (qualifying the

22   general rule excluding the de minimis use of force from Eighth Amendment recognition

23   where the use of force is "of a sort repugnant to the conscience of mankind")(internal

24   quotation marks and citations omitted); Henderson v. City and County of San Francisco,

25   2006 WL 3507844 *4 (N.D. Cal. 2006)("Whether the alleged wrongdoing is objectively

26   'harmful enough' to establish a constitutional violation . . . depends on contemporary

27   standards of decency")(citations omitted).  Thus, the operative focus is on the nature and

28

32

1   amount of the force used, not the nature or severity of the injury inflicted   Oliver v.

2   Keller, 289 F.3d 623, 628 (9th Cir. 2002)(stating that the Eighth Amendment standard

3   enunciated in  Hudson does not create a de minimis injury physical injury requirement);

4   Felix v. McCarthy, 939 F.2d 699, 702 (9th Cir. 1991)(stating that "it is not the degree of

5   injury which makes out a violation of the [E]ighth [A]mendment").

6        Several factors are relevant when determining whether a prison officer's use of

7   force crosses the constitutional line, including "'the need for the application of force, the

8   relationship between that need and the amount of force used,  the threat reasonably

9   perceived by the responsible officials, and any efforts made to temper the severity of a

10  forceful response," as well as "'the extent of the injury suffered by the inmate.'"

11  Hudson, 503 U.S. at 7, quoting Whitley, 475 U.S. at 321 (internal quotation marks

12  omitted). "From [these] considerations inferences maybe drawn whether the use of force

13  could plausibly have been thought necessary [in a particular situation], or instead

14  evinced such a wantonness with respect to the unjustified infliction of harm as is

15  tantamount to a knowing intention that it occur." Whitley, 475 U.S. at 321; accord

16  Hudson, 503 U.S. at 7.

17       With respect to the need for the application of force, as a preliminary matter, there

18  is no apparent dispute that plaintiff was informed that he would be required to double

19  cell with another inmate and refused to do so, that he refused to relinquish his property in

20  response to the property restriction imposed as a result, and that he refused to "cuff up"

21  when ordered to do so.  Plaintiff's admitted resistance and refusal to comply with these

22  orders – even if he did so out of concern about his well being – arguably created a need

23  for the use of some force "to maintain or restore discipline." See White v. Roper, 901

24  F.2d 1501, 1507 (9th Cir. 1990)(concluding that need to apply force to restrain and

25  subdue pretrial detainee was created when detainee refused to enter and moved away

26  from a cell to which he had been assigned, even though detainee did so in order to avoid

27  being injured by the new cell mate).

28

1    Yet, although defendants point to plaintiff's refusal to "cuff up," they otherwise

2    contend that plaintiff's refusal to cooperate with the property restriction order or to

3    accept a cell mate played no role in the cell extraction and consequent application of

4    force. Rather, defendants point to plaintiff's covering his cell door and 'gassing"

5    Herrera and Colunga – both allegations of which plaintiff specifically and categorically

6    denies. Plaintiff, on the other hand, contends that the unlawful application of force was

7    precipitated by his refusal to cooperate with the property restriction. This is evident,

8    according to plaintiff, by Colunga's threat that he would get a cell extraction team, that

9    they would beat him up, and get his property no matter what. [Plft. Dec. at ¶ 8; Opp. at

10   5.] Defendants categorically deny that plaintiff was so threatened.

11   Ultimately, however, defendants contend that the cell extraction was an emergency

12   procedure carried out at Morong's request, and that they used only that force necessary

13   to restrain and remove plaintiff from the cell. As to the first contention, plaintiff does

14   not dispute that Morong reviewed his medical (psychiatric) file or that Morong's review

15   of plaintiff's medical records informed Morong's assessment of the circumstances.

16   Rather, plaintiff specifically disputes the circumstances themselves, including that he did

17   not cover his cell door, fail to respond, or make the inflammatory statements attributed to

18   him and relied upon by Morong. Notably, there is no contention or indication in the

19   record that plaintiff's psychiatric history was sufficient in and of itself to justify an

20   emergency cell extraction as opposed to the calculated procedure otherwise

21   contemplated by defendants. In short, plaintiff counters Morong's determination that an

22   "emergency" existed necessitating the cell extraction.

23   These counter-allegations evidence a clear, and not immaterial, factual dispute as

24   to defendants' motivation and justification for the cell extraction – both of which are

25   relevant to the credibility of the witnesses and the particular issue whether the force

26   applied was in good faith or malicious and wanton. However, they do not settle the

27   fundamental question whether a need for the application of some force was present. As

28

34

1  to that question, the need for some force, at least as a consequence of plaintiff's refusal
2  to "cuff up," is sufficiently evident in the record.  Moreover, plaintiff does not
3  specifically challenge the propriety of a cell extraction in this instance.  Nor does he
4  dispute that the cell door had to be manually, i.e., forced, open.  Thus, as to this
5  component of the Eighth Amendment analysis, no genuine issue of material fact is
6  raised.

7       Nevertheless, the fact that application of some force was constitutionally
8  permissible does not end the analysis.  As to all of the remaining considerations relevant
9  to the Eighth Amendment analysis, the record is far murkier.  Defendants assert that
10  plaintiff was sprayed with pepper spray after he threw a liquid at Juno and ignored
11  repeated orders to get down on the floor.   Plaintiff counters that he did not throw
12  anything at the defendants, that he got down when ordered to do so and was already
13  down on the floor when he was sprayed and defendants entered his cell.[40]  Defendants
14  contend that plaintiff resisted and struggled with them, swung at and struck them, and
15  kicked, and that they used only that force necessary to restrain and handcuff him.
16  Plaintiff states that he did not resist or attempt to strike the defendants, and that
17  defendants repeatedly punched and "stumped" him even after he was handcuffed.

18       Defendants nevertheless criticize plaintiff for not alleging, with specificity,
19  precisely which officer delivered a particular blow, suggesting that if plaintiff was in fact
20  face down during the altercation as he alleges, he cannot identify whether or not any
21  defendant participated and if so, how.  [Def. Reply at 3.]    Plaintiff counters that

22
23
24  [40]As noted above, although Williamson and Hamlin attribute plaintiff's compliance
    with the order to get down to the effects of the pepper spray, they confirm plaintiff's
25  allegation that he was already on the floor when the extraction team entered.  Juno
    similarly reported in two incident reports that plaintiff was face down on the ground
26  before the team entered.   In apparent contradiction, Colunga insists that plaintiff did not
27  respond to orders to get down on the floor and states that plaintiff fell to the floor after
28  being struck with Juno's shield.

1   although face down, he "was not blindfolded when the assault took place, he was able to
2   view the defendants before the cell extraction [sic] enter the cell and during the assault
3   itself, plaintiff seen [sic] as each of the defendants punch and stump him, while he was
4   on the floor face down." [Pltf. Reply at 1-2.]

5          This dispute, however, only highlights that summary judgment is inappropriate. It
6   is not disputed that some  force was applied.  Colunga, Juno, and Herrera each admit to
7   personally using physical force to restrain and remove plaintiff from the cell.  These
8   admissions of involvement in the altercation and of the use of some physical force are
9   sufficient to permit "the necessary inference that [each] were integral participants in the
10  alleged unlawful act." Lolli v. City of Orange, 351 F.3d 410, 417 (9th Cir. 2003)(internal
11  quotation marks and citation omitted).  However debatable the strength of this inference,
12  viewing the evidence in a light most favorable to plaintiff, it would not be unreasonable
13  for the jury to make it.  As in Lolli,  summary judgment here would be inappropriate
14  based "on the happenstance of whether [plaintiff] was held face up or face down on the
15  ground." Id. at 418.

16         Moreover, although Williamson denies that he entered the cell, plaintiff
17  specifically contends otherwise.  In any event, there is no dispute that Williamson was a
18  part of the extraction team and that his (and Colunga's) admitted use of pepper spray on
19  plaintiff was an integral component of the force applied.   Use of pepper spray against an
20  allegedly compliant inmate is sufficient involvement in the constitutional violation to
21  withstand summary judgment.  Lolli, 351 F.3d at 417-418 (noting that the use of pepper
22  spray alone may be found to be more than a de minimis application of force).

23         Finally, defendants contend that plaintiff "received no real injuries" as a result of
24  the incident. [Def. Reply at 4.]   However, neither the videotaped interview of plaintiff
25  after the incident nor the  photographs taken by Hamlin, nor any other evidence in the
26  record, utterly, unequivocally or blatantly discredits plaintiff's description of his injuries
27  such that no jury could believe him. Cf Scott v. Harris. at 1776.  Moreover, as set out
28

1   above, no particular or degree of injury is required to sustain an Eighth Amendment

2   violation.  The focus remains on the nature and extent of the force applied, not the

3   injuries sustained.  However characterized, the blows directed at plaintiff, which resulted

4   in bruises and other injuries, are not <u>de</u> <u>minimis</u> under Eighth Amendment standards.

5   See <u>Hudson</u>, 503 U.S. at 10; <u>see also</u> <u>Vega</u>, 2007 WL 214599 *6 (concluding that it was

6   sufficient that "although plaintiff did not receive grievous injuries," he was undisputably

7   bruised); <u>Bragg</u>, 2006 WL 2785075 *2-4 (material factual dispute existed as to whether

8   plaintiff's injuries suggested more than the <u>de</u> <u>minimis</u> use of force where plaintiff

9   alleged that he suffered a gash on his right hand, for which he received a butterfly stitch

10  and band-aids and a large bump on his head, whereas defendants' medical examiner

11  reported only minor lacerations to two knuckles and no other injuries).

12         Thus, a factual dispute is present as to virtually every fact of consequence relating

13  to the nature, justification for, and extent of the force applied.  Judgment in defendants'

14  favor cannot be granted without accepting defendants' version of the events as true, and

15  wholly disbelieving plaintiff's. See <u>Carrasco v. Campangna</u>, 2005 WL 2171884 *5 (N.D.

16  Cal. 2005)(stating that if believed, "Plaintiff's version that he was beaten while offering

17  no resistence and after being handcuffed would lead to the conclusion that the force used

18  was excessive[,]" whereas Defendants' version "of using the force necessary to subdue a

19  resisting inmate and denial that plaintiff was struck after he was handcuffed, [if

20  believed,] would lead to conclusion that the force used was not excessive").  As noted

21  above, credibility determinations and the weight to be given to the evidence are matters

22  for the jury; "[a] trier of fact must hear both versions and decide whom to believe." <u>Id</u>.;

23  see also <u>Creal v. City of Fairfield</u>, 2007 WL 2019624 (E.D. Cal. 2007)(summary

24  judgment denied in a Fourth Amendment excessive force case where the officer alleged

25  that after plaintiff bit him, he struck back in self defense and plaintiff denied biting the

26  officer and stated that the officer punched her several times, noting that adopting

27  defendant's version of the facts "would require [the court] to make a favorable

28

37

1   interpretation of [the] credibility [of the defenses' witnesses] and a weighing of the

2   medical evidence, neither of which are appropriate as "those determinations are the

3   province of the jury")(citing Anderson, 477 U.S. at 255)).

4        In sum, a jury could reasonably conclude that defendants' application of force was

5   unnecessarily excessive under the circumstances and not undertaken in a good faith

6   effort to restore discipline or order. Thus, summary judgment is precluded. See Watts v.

7   McKinney, 394 F.3d 710, 711-712 (9th Cir. 2004)(plaintiff's declaration describing the

8   vengeful acts of a frustrated investigator, sufficiently alleged both the unconstitutional

9   purpose and deeds); Martinez, 323 F.3d at 1184 (summary judgment inappropriate where

10  plaintiff admitted that he covered his cell door to prevent pepper spray directed at

11  another inmate to filter into his cell but otherwise denied that he barricaded his cell or

12  "gassed" or threatened the defendants, that defendants fired plastic bullets and a taser

13  cartridge into his cell and then entered, pushed him into a seated position, tasered him

14  again, and beat him even though he offered no resistance, and continued to beat him after

15  he was handcuffed and before dragging him out and taking him to the infirmary, and

16  defendants countered that  plaintiff barricaded cell door with a mattress, gassed the

17  officers, refused to submit to handcuffing, violently resisted during the ensuing

18  "extraction process," and was  punching and kicking the officers before he was finally

19  subdued); Vera v. Alameida, 2007 WL 214599 *5-6 (E.D. Cal. 2007)(summary

20  judgment on excessive force claim improper where parties disputed whether plaintiff

21  verbally or physically refused to obey an order; under such circumstances, whether force

22  was necessary, and if so, whether permissible bounds were exceeded, were questions for

23  the jury); Henderson, 2006 WL 3507944 *5 (summary judgment on excessive force

24  claim inappropriate where the need for use of any force, and if so, the appropriate level

25  of force necessary, depended "on whose version of the events one believes"); Bragg v.

26  Russell, 2006 WL 2785075*4  (N.D. Cal. 2006)(summary judgment inappropriate where

27  plaintiff alleged that defendant knew that force was unnecessary but nevertheless used

28

38

force intended to cause injury, and where defendant countered that plaintiff disobeyed an order, attempted to flee, and resisted attempts to be restrained, thereby necessitating sufficient force to subdue and handcuff plaintiff); compare Wilkins v. Ramirez, 455 F.Supp.2d 1080, 1091-1096 (S.D. Cal. 2006)(summary judgment proper where the undisputed facts showed that plaintiff verbally disagreed with an instruction given to him during a fire drill evacuation where other inmates were present, that en route to the Watch Tower office plaintiff resisted and bit one of the officers attempting to restrain him, and where record indicated that defendants tempered their use of force).

Finally, viewing the facts in a light most favorable to plaintiff, no reasonable prison guard could have believed that the nature and amount of force used against plaintiff was justified. Stated differently, reasonable prison guards in defendants' position would have known that use of excessive force violated plaintiff's rights. See Saucier v. Katz, 533 U.S. 194, 201-202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Martinez, 323 F.3d at 1183-1184 (stating that "the law regarding a prison guard's use of excessive force was clearly established by 1994," citing Hudson and Whitley). Accordingly, defendants are not entitled to summary judgment on the basis of qualified immunity.

## VII.  CONSPIRACY

To establish a conspiracy, plaintiff must establish the existence of an agreement or "meeting of the minds" to violate his constitutional rights, Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002)(additional citation omitted), and that an "actual deprivation of [plaintiff's] constitutional rights resulted from the alleged conspiracy." Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006), quoting Woodrum v. Woodward County, Okl., 866 F.2d 1121, 1126 (9th Cir. 1989). Specifically, conspiracy requires proof that defendants "intended to violate [plaintiff's] constitutional rights." Hart, 450 F.3d at 1069; citing Franklin, 312 F.3d at 441; see Woodrum, 866 F.2d at 1126 (noting that conclusory allegations are insufficient to establish these necessary prerequisites). However,

1   "[d]irect evidence of improper motive or an agreement to violate a plaintiff's

2   constitutional rights will only rarely be available. Instead, it will almost always be

3   necessary to infer such agreements from circumstantial evidence or the existence of joint

4   action." Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1302

5   (9th Cir. 1999).   Thus, "an agreement need not be overt, and may be inferred on the

6   basis of circumstantial evidence such as the actions of the defendants." Id at 1301.

7   Questions regarding an individual's state of mind "are generally factual issues

8   inappropriate for resolution on summary judgment." Id at 1302 (internal quotation

9   marks and citation omitted).

10      As discussed above, the evidence is sufficient to withstand summary judgment on

11   plaintiff's claim of excessive force.  Viewing the evidence in the light most favorable to

12   plaintiff, it would not be wholly unreasonable for a jury to infer from defendants'

13   conduct a consensus among them – namely, a "meeting of the minds" –  to physically

14   punish plaintiff for his recalcitrance.  If the jury so believes, the further inference that

15   defendants sought to cover up their individual and collective use of excessive force by

16   subsequently submitting false reports would not be unreasonable.  Id. at 1301 (stating

17   that "a showing that the alleged conspirators have committed acts that are unlikely to

18   have been undertaken without an agreement may allow a jury to infer the existence of a

19   conspiracy"). [41]  Thus, summary judgment on the conspiracy claim should be denied.

20

21      [41]Plaintiff further alleges – albeit without specifying a particular time frame – that

22   defendants wear pins on their uniforms bearing the initials "CYA" ("cover your ass"),

23   which is indicative of their "buddy system" and willingness to cover each other's

24   misdeeds. [Opp. at 19.]  Plaintiff supports this allegation with the declaration of Ruben

     Garcia, who was plaintiff's cell mate in Administrative Segregation after release from

25   the suicide watch.  Garcia declares that he witnessed Colunga, Herrera, Juno,

26   Williamson, as well as Hamlin and others, wearing pins on their uniforms with the letters

27   "CYA" on them, although his declaration does not make clear when. [Opp. Ex. H.]  The

     only evidence in the record controverting this allegation is Herrera's denial that he wears

28                                                                                  (continued...)

40

## VIII. RETALIATION

It is long settled "that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." Hartman v. Moore, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006); Perry v. Sinderman, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) (government officials may not punish a person or deprive him or her of a benefit on the basis of his or her "constitutionally protected speech"). "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of [that] right." Hartman, 547 U.S. at 256, quoting Crawford-El v. Britton, 523 U.S. 574, 588 n. 10, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)(internal quotation marks omitted); Perry v. Sinderman, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)(retaliation by a government official for the exercise of a First Amendment right is actionable because if it were not, retaliatory actions would tend to chill an individual's exercise of his or her constitutional rights). To make out a claim of retaliation in this context, it is not necessary to establish a total chilling of First Amendment rights (i.e., complete cessation of the pursuit of grievances or litigation); "[s]peech can be chilled even when not completely silenced." Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).

In the prison context, inmates "retain those First Amendment rights that are not inconsistent with [their] status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 41

---

[41](...continued)

pins on his uniform. [Opp. Ex. B (Defendant Herrera's Response to Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 25).] With this sole exception, none of the Defendants in their declarations have denied or even mentioned the allegation regarding the "CYA" pins. Absent any other possible meaning of the letters "CYA," that any or most of the defendants wore visible pins bearing these letters may be relevant to show a "meeting of the minds" among them, from which a willingness to cover each other's misdeeds could be further inferred. What weight, if any, to be given to such evidence, remains for the jury.

1  L.Ed.2d 495 (1974).  Particularly, prisoners retain their First Amendment right to pursue

2  claims and grievances, and the right to do so without being subjected to acts of

3  retaliation by prison or other government officials in response.  Rhodes, 408 F.3d at

4  567-568;  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).  A retaliation claim in this

5  context does not require that plaintiff show a constitutional entitlement to or interest in

6  the action complained of.  Pratt, 65 F.3d at 806.  Rather, the crux of the claim is that the

7  challenged action advanced no legitimate correctional goal, and was instead in retaliation

8  for the inmate's protected speech activities.  Id.  ("plaintiff bears the burden of pleading

9  and proving the absence of legitimate correctional goals for the conduct of which he

10  complains").

11      Thus, "[w]ithin the prison context, a viable claim of First Amendment retaliation

12  entails five basic elements: (1) An assertion that a state actor took some adverse action

13  against an inmate; (2) because of (3) that prisoner's protected conduct, and that such

14  action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action

15  did not reasonably advance a legitimate correctional goal."  Rhodes, 408 F.3d at 567-568

16  (additional citations omitted).

17      Review of the evidence establishes that Fortaleza and Fitter – to the extent that

18  each of them refused to renew the medical chronos sought – took adverse action against

19  plaintiff.  Plaintiff has documented some history of engaging in protected conduct,

20  including  past grievances against  Fitter in 2002 ( both of which were resolved in

21  plaintiff's favor) as well as the grievance at issue here.  There is no apparent dispute that

22  at some point during his examination of plaintiff on February 5, 2004 , Fortaleza made

23  the statement to plaintiff "You can appeal my decision, like you always appeal

24  everything else."  The record is undisputed that further review of  Fortaleza's decision –

25  prompted by plaintiff's complaints, grievance, and appeals – resulted in two of the four

26  chronos being issued.  Moreover, it appears from the record that plaintiff retained a

27  lower bunk assignment irrespective of Fortaleza's decision. [See Mallory Dec., Ex. A

28

(indicating that from November 17, 2003 through January 22, 2007 plaintiff was assigned a lower bunk).]

This evidence, even viewed in the light most favorable to plaintiff, is insufficient to raise a genuine issue of material fact whether Fitter and Fortaleza denied plaintiff medical chronos because of (and in retaliation for) plaintiff's pursuit of grievances against them. Specifically, evidence from which retaliatory intent or motive can be inferred is lacking. Plaintiff has not shown any history of grievances or appeals against Fortaleza, and in fact stated at his deposition that he did not think he had filed one against him before the present instance. [Coleman Dec., Ex. A (Plaintiff's Deposition at p. 88.] A retaliatory motive cannot be persuasively attributed to an action that precedes – not follows – protected conduct.

On the other hand, plaintiff has documented two prior, successful grievances that he filed against Fitter. [See Opp. Exs. Q, R.] Both , however, occurred in 2002, long before the instant case. For his part, Fitter denies that he was aware of any grievances made against him by plaintiff, and explains that he "would not necessarily be aware of an inmate's appeal unless [he] was asked to respond to it informally or formally." [Opp. Ex. B (Defendant J. Fitter's Response to Plaintiff's First Set of Interrogatories, at page 4 (Response to Interrogatory No. 8)).] Plaintiff's allegation that Fitter would deny plaintiff necessary medical care, or refuse to rein in a negligent physician under his supervision, in retaliation for grievances filed by plaintiff against him almost two years prior claims too much based on too little. Compare Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003)(recognizing that the timing of an adverse decision in relation to the protected conduct can be circumstantial evidence of retaliatory intent, particularly, where, for example, the adverse action occurs soon after the plaintiff's successful pursuit of a grievance).

Nor does retaliatory intent or motive follow from Fortaleza's apparent knowledge – reasonably inferred from his statement that "you appeal everything else" – that plaintiff

43

1   had pursued grievances in the past against other medical staff.   It may well be that  the
2   medical staff considered plaintiff to be a "complainer," as he alleges. [See Opp. at 27.]
3   The Ninth Circuit has noted that reputation evidence of this sort may support an
4   inference that an adverse action taken by a prison official against an inmate was
5   retaliatory.  See Hines v. Gomez, 108 F.3d 265, 268 (9th Cir. 1997)(recognizing that
6   plaintiff's prolific use of the prison grievance system and reputation for "complaining"
7   or "whining" is probative circumstantial evidence whether defendant's intent and motive
8   in falsely reporting plaintiff for a prison violation was retaliatory).  In Hines, the
9   evidence showed that the defendant falsely reported that the plaintiff had violated a
10  prison rule, after being informed by the plaintiff – who had an apparently well-deserved
11  reputation for "complaining" – threatened to "grievance" the defendant.  This evidence,
12  in toto,  was found sufficient to establish that the false complaint was made in retaliation
13  for plaintiff's use of the grievance system.  Id.

14       In comparison, the record here shows that "complaining" by inmates about their
15  medical treatment and medical decisions is fully expected by the medical staff.   Plaintiff
16  does not dispute that, in fact,  "[i]nmates are encouraged to file appeals if they are
17  dissatisfied with any medical decision" [Fortaleza Dec. at ¶ 10](emphasis added), and
18  that such grievances and appeals are routine. [Fitter Dec. at ¶ 4.]    All medical staff
19  know that a challenged medical decision will be independently reviewed.  [Fortaleza
20  Dec. at ¶ 10;  Fitter Dec. at ¶ 4.]  It is further evident from the record that such review
21  may expose or result in differing medical views and treatment in a particular case, as
22  plaintiff's circumstances themselves demonstrate.

23       Here, that review both affirmed  Fortaleza's denial of two of the requested chronos
24  – for a lower bunk and restricted activity – and effectively reversed his denial of  the soft
25  shoe and knee brace chronos.  That other physicians independently agreed with
26  Fortaleza at least in part (which plaintiff does not dispute), breaks the reasonable chain
27  of inferences required to support the conclusion that  Fortaleza's decision was
28

44

1   retaliatory, rather than medically based.

2       In short, crucial evidentiary links in the logical chain required to support

3   plaintiff's claim that he was denied the chronos in retaliation for engaging in protected

4   speech are lacking in the record.  Within constitutional limits not at issue here, legitimate

5   correctional goals are advanced when medical staff diagnose medical conditions and

6   prescribe appropriate mediation or treatment for inmates.[42]   This is all the more true

7   where, as here, the requested medical action might afford plaintiff a particular privilege

8   or status likely unavailable to most inmates.

9       For these reasons, no genuine issue of material fact has been established that the

10  challenged action taken was in retaliation for the exercise of plaintiff's First Amendment

11  rights.  Accordingly, defendants Fitter and Fortaleza are entitled to summary judgment

12  on the retaliation claim.

13                          **RECOMMENDATION**

14      It is recommended that the Court issue an Order: (1) approving and adopting this

15  Report and Recommendation; (2) granting defendants' Motion for Summary Judgment

16  with respect to plaintiff's retaliation claim; and (3) denying defendants' Motion for

17  Summary Judgment as to plaintiff's excessive force and conspiracy claims.

18

19  DATED: _2/13/08_____

20

21

22                          STEPHEN J. HILLMAN
                            UNITED STATES MAGISTRATE JUDGE
23

24      [42]The court notes, in this regard, that irrespective of plaintiff's broad allegations

25  that Fortaleza and Fitter were deliberately indifferent to his medical needs, plaintiff stops

26  short – rightly so on this record – of asserting an Eighth Amendment violation on this
    ground.  See Sanchez v. Vild, 891 F.3d 240, 242 (9th Cir. 1989)(holding that "[a]

27  difference of medical opinion does not amount to a deliberate indifference to [plaintiff's]

28  serious medical needs").

                              45